Slip Op. 19-79

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| PERFECTUS ALUMINUM, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE, <br><br> Defendant-Intervenor. | Before: Gary S. Katzmann, Judge <br> Court No. 18-00085 |

## <u>OPINION</u>

[Defendant-Intervenor's motion to dismiss is denied.  Plaintiff's motion to supplement the record by taking judicial notice of the complaint in <u>United States v. Real Property Located at 10681 Production Avenue, Fontana California</u>, Court No. 5:17-cv-01872 is granted.  Plaintiff's motion for judgment on the agency record is denied.]

Dated: July 1, 2019

<u>David J. Creegan</u>, White and Williams LLP, of Philadelphia, PA, argued for plaintiff.  With him on the brief was <u>Platte B. Moring, III</u>; and <u>J. Kevin Horgan</u>, deKieffer & Horgan, of Washington, DC, argued for plaintiff.

<u>Amie Lee</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, argued for defendant.  With her on the brief were <u>Joseph H. Hunt</u>, Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>L. Misha Preheim</u>, Assistant Director. Of counsel was <u>Orga Cadet</u>, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Robert E. DeFrancesco, III</u>, Wiley Rein LLP, of Washington, DC, argued for defendant-intervenor. With him on the brief was <u>Alan H. Price</u>.

Katzmann, Judge:  Can an electronic transmission -- or only snail mail -- qualify as a "mailing?"  Do certain pallet products fall within the plain meaning of the scope of an order seeking to effectuate fair trade for domestic producers and industry?  This case involves these jurisdictional and scope interpretation issues.  Plaintiff Perfectus Aluminum, Inc., ("Perfectus") is an importer and distributor of aluminum extrusions.  Defendant-Intervenor Aluminum Extrusions Fair Trade Committee ("AEFTC") is a trade association of domestic producers of aluminum extrusions that requested a scope ruling finding that Perfectus's pallet products composed of aluminum extrusions are subject to the antidumping and countervailing duty orders on aluminum extrusions from the People's Republic of China.  Aluminum Extrusions from the People's Republic of China: Antidumping Duty Order, 76 Fed. Reg. 30,650 (Dep't Commerce May 26, 2011) ("Antidumping Duty Order"); Aluminum Extrusions from the People's Republic of China: Countervailing Duty Order, 76 Fed. Reg. 30,653 (Dep't Commerce May 26, 2011) ("Countervailing Duty Order") (collectively, the "Orders").  The United States Department of Commerce ("Commerce") found that Perfectus's merchandise is within the plain language of the scope of the Orders and instructed United States Customs and Border Protection ("Customs") to continue to suspend liquidation of entries back to the date of the first suspension of Perfectus's merchandise.  Perfectus appeals Commerce's determination. AEFTC counters that this appeal is untimely because it was commenced more than thirty days after notification of the final scope ruling through email notification, that the case should be dismissed for lack of jurisdiction, and that, in any event, Commerce did not err in its scope ruling.  The court (1) concludes that jurisdiction over this action exists because Perfectus's complaint seeking review of the scope ruling was filed within thirty days of the mailing by post of that ruling as required by statute and

was therefore timely, and (2) sustains Commerce's finding that the pallet products fall within the

plain language of the scope of the <u>Orders</u>.

**BACKGROUND**

### I.  *Legal and Regulatory Framework of Scope Reviews Generally*

Dumping occurs when a foreign company sells a product in the United States for less than

fair value -- that is, for a lower price than in its home market.  <u>Sioux Honey Ass'n v. Hartford Fire

Ins. Co.</u>, 672 F.3d 1041, 1046 (Fed. Cir. 2012)).   Similarly, a foreign country may provide a

countervailable subsidy to a product and thus artificially lower its price.  <u>U.S. Steel Grp. v. United

States</u>, 96 F.3d 1352, 1355 n.1 (Fed. Cir. 1996).   To empower Commerce to offset economic

distortions caused by dumping and countervailable subsidies, Congress enacted the Tariff Act of

1930.[1]  <u>Sioux Honey Ass'n</u>, 672 F.3d at 1046–47.  Under the Tariff Act's framework, Commerce

may -- either upon petition by a domestic producer or of its own initiative -- begin an investigation

into potential dumping or subsidies and, if appropriate, issue orders imposing duties on the subject

merchandise.  <u>Id.</u>

Because the description of products contained in the scope of an antidumping or

countervailing duty order must be written in general terms to encompass the full range of subject

merchandise, issues may arise as to whether a particular product is included within the scope of

the order.   <u>See</u> 19 C.F.R. § 351.225(a).  To provide producers and importers with notice as to

whether their products fall within the scope of an antidumping or countervailing duty order,

Congress authorized Commerce to issue scope rulings clarifying "whether a particular type of

merchandise is within the class or kind of merchandise described in an existing . . . order."  19

---

[1]  Further citations of the Tariff Act of 1930 are to the relevant portions of Title 19 of the U.S. Code, 2012 edition.

U.S.C. § 1516a(a)(2)(B)(vi).  As "no specific statutory provision govern[s] the interpretation of

the scope of antidumping or countervailing orders," Commerce and the courts developed a three-

step analysis.  Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States, 776 F.3d 1351,

1354 (Fed. Cir. 2015); Polites v. United States, 35 CIT __, __, 755 F. Supp. 2d 1352, 1354 (2011);

19 C.F.R. § 351.225(k).

Because "[t]he language of the order determines the scope of an antidumping duty order[,]"

any scope ruling begins with an examination of the language of the order at issue.  Tak Fat Trading

Co. v. United States, 396 F.3d 1378, 1382 (Fed. Cir. 2005) (citing Duferco Steel, Inc. v. United

States, 296 F.3d 1087, 1097 (Fed. Cir. 2002)).  If the terms of the order are unambiguous, then

those terms govern.  Id. at 1382–83.  "[T]he question of whether the unambiguous terms of a scope

control the inquiry, or whether some ambiguity exists is a question of law that we review de novo."

Meridian Prod., LLC v. United States, 851 F.3d 1375, 1382 (Fed. Cir. 2017).  "Although the scope

of a final order may be clarified, it can not be changed in a way contrary to its terms."  Duferco,

296 F.3d at 1097 (quoting Smith Corona Corp. v. United States, 915 F.2d 683, 686 (Fed. Cir.

1990)).  For that reason, "if [the scope of an order] is not ambiguous, the plain meaning of the

language governs."  ArcelorMittal Stainless Belg. N.V. v. United States, 694 F.3d 82, 87 (Fed.

Cir. 2012).

"In determining the common meaning of a term, courts may and do consult dictionaries,

scientific authorities, and other reliable sources of information, including testimony of record."

NEC Corp. v. Dep't of Commerce, 23 CIT 727, 731, 74 F. Supp. 2d 1302, 1307 (1999) (quoting

Holford USA Ltd. v. United States, 19 CIT 1486, 1493–94, 912 F. Supp. 555, 561 (1995)).

Furthermore, "[b]ecause the primary purpose of an antidumping order is to place foreign exporters

on notice of what merchandise is subject to duties, the terms of an order should be consistent, to

the extent possible, with trade usage." ArcelorMittal, 694 F.3d at 88.

If Commerce determines that the terms of the order are either ambiguous or reasonably

subject to interpretation, then Commerce "will take into account . . . the descriptions of the

merchandise contained in the petition, the initial investigation, and [prior] determinations [of

Commerce] (including prior scope determinations) and the [International Trade] Commission."

19 C.F.R. § 351.225(k)(1) ("(k)(1) sources"); Polites, 755 F. Supp. 2d at 1354; Meridian, 851 F.3d

at 1382.  To be dispositive, the (k)(1) sources "must be 'controlling' of the scope inquiry in the

sense that they definitively answer the scope question." Polites, 755 F. Supp. 2d at 1354 (quoting

Sango Int'l v. United States, 484 F.3d 1371, 1379 (Fed. Cir. 2007)).  If Commerce "can determine,

based solely upon the application and the descriptions of the merchandise referred to in paragraph

(k)(1) of . . . section [351.225], whether a product is included within the scope of an order . . .

[Commerce] will issue a final ruling[.]"  19 C.F.R. § 351.225(d).

If a § 351.225(k)(1) analysis is not dispositive, Commerce will initiate a scope inquiry

under § 351.225(e) and apply the five criteria from Diversified Prods. Corp v. United States, 6 CIT

155, 162, 572 F. Supp. 883, 889 (1983) as codified in 19 C.F.R. § 351.225(k)(2).[2]

### II.  Factual and Procedural History of the Orders

On May 26, 2011, after the International Trade Commission had determined that imports

of certain aluminum extrusions were materially injuring United States industry, Commerce issued

---

[2]  These criteria are: (1) the physical characteristics of the product, (2) the expectations of the
ultimate purchasers, (3) the ultimate use of the product, (4) the channels of trade in which the
product is sold, and (5) the manner in which the product is advertised and displayed.  19 C.F.R. §
351.225(k)(2); see Diversified Prods., 572 F. Supp. at 889.

antidumping and countervailing duty orders covering 1xxx, 3xxx, and 6xxx aluminum extrusions

from China.  Orders.  The scope of the Orders reads, in relevant part:

> The merchandise covered by the order is aluminum extrusions which are shapes
> and forms, produced by an extrusion process, made from aluminum alloys having
> metallic elements corresponding to the alloy series designations published by The
> Aluminum Association commencing with the numbers 1, 3, and 6 . . .
>
> The scope . . . excludes finished merchandise containing aluminum extrusions as
> parts that are fully and permanently assembled and completed at the time of entry,
> such as finished windows with glass, doors with glass or vinyl, picture frames with
> glass pane and backing material, and solar panels.

Antidumping Duty Order, 78 Fed. Reg. at 30,650–51.[3]

### III. Factual and Procedural History of this Case

On March 3, 2017, AEFTC filed a request with Commerce to determine that certain 6xxx

aluminum extrusions from China are within the scope of the Orders.  Petitioner's Scope Ruling

Request for 6xxx Series Aluminum Pallets (Mar. 3, 2017), Public Record ("P.R.") 1–7,

Confidential Record ("C.R.") 1–7 ("6xxx Scope Ruling Request").  In the 6xxx Scope Ruling

Request, AEFTC described the merchandise at issue as follows: "extruded profiles made of series

6xxx aluminum alloy cut-to-length and welded in the shape of pallets . . . regardless of producer

or exporter."  Id. at 5.

Commerce issued the requested scope ruling on June 13, 2017, finding that the

merchandise at issue is subject to the Orders.  Antidumping and Countervailing Duty Orders on

Aluminum Extrusions from the People's Republic of China: Final Scope Ruling on Certain

Aluminum Pallets (June 13, 2017), P.R. 28 ("6xxx Final Scope Ruling").  Specifically, Commerce

found that the merchandise at issue is within the plain language of the scope of the Orders, the

---

[3] The Antidumping Duty Order and Countervailing Duty Order are materially similar for purposes
of this proceeding.

finished merchandise exclusion does not apply here, and the merchandise at issue is in existence.

Id. at 13, 15.  Commerce further instructed Customs to continue to suspend liquidation of entries

back to the merchandise at issue's date of first suspension.  Id. at 15.  On March 27, 2018, upon

realizing that it had not previously done so, Commerce mailed the notice of the 6xxx Final Scope

Ruling.[4]  See Memorandum re: Antidumping and Countervailing Duty Orders on Aluminum

Extrusions from the People's Republic of China: March 27, 2018 Mailing of Final Scope Ruling

on Certain Aluminum Pallets, (June 4, 2017), P.R 34 ("Proof of Mailing").  Within thirty days of

that mailing, Perfectus filed a summons and complaint with this court.  Summ., Apr. 23, 2018,

ECF No. 1; Compl., Apr. 25, 2018, ECF No. 9.

On August 3, 2018, AEFTC moved to dismiss this case on the grounds that Perfectus's

complaint was untimely.  Def.-Inter.'s Mot. to Dis., ECF No. 25 ("Def.-Inter.'s MTD Br.").

Perfectus and the Government both filed briefs opposing AEFTC's motion on August 28, 2018.

Pl.'s Resp. to Mot. to Dis., ECF No. 28 ("Pl.'s Resp. to MTD"); Def.'s Resp. to Mot. to Dis., ECF

No. 26 ("Def.'s Resp. to MTD").  AEFTC filed a brief in further support of its motion to dismiss

on October 29, 2018.  Def.-Inter.'s Mot. to Dis. Reply, ECF No. 32 ("Def.-Inter.'s MTD Reply").

On October 30, 2018, Perfectus moved for judgment on the agency record pursuant to Rule 56.2

of this court.  Pl.'s Mot. for J. on the Agency Record, ECF No. 34.  Earlier, on August 28, 2018,

Perfectus had filed its brief in support of a motion for judgment on the agency record.  Pl.'s 56.2

Br., ECF No. 27.  The Government and AEFTC both responded to Perfectus's motion on

November 16, 2018.  Def.'s Resp. to 56.2 Mot., ECF No. 36; Def.-Inter.'s Resp. to 56.2 Mot., ECF

---

[4]  Although the communications themselves are not part of the administrative record, Perfectus states that on (i) August 15, 2017, it alerted Commerce that it had yet to receive mailed notice of the 6xxx Final Scope Ruling and (ii) on March 26, 2018, Perfectus threatened to sue Commerce if it did not provide mailed notice of the 6xxx Final Scope Ruling.  Pl.'s Opp'n to Mot. to Dismiss, Aug. 28, 2018, ECF No. 28 at Exs. A, B.

No. 37.  Perfectus filed its reply to the Government and AEFTC on December 31, 2018.  Pl.'s

Reply to 56.2 Mot., ECF No. 39.  On January 10, 2019, Perfectus moved to supplement the record.

Pl.'s Br. for Mot. to Suppl., ECF No. 42.  The Government responded on February 8, 2019.  Def.'s

Resp. to Mot. to Suppl., ECF No. 48.[5]  Oral argument was held before this court on March 20,

2019.  ECF No. 53.  On June 12, 2019, the parties filed supplemental submissions.  Pl.'s Suppl.

Br., ECF No. 60; Def.'s Suppl. Br., ECF No. 61; Def.-Inter.'s Suppl. Br., ECF No. 62.

## DISCUSSION

### I.  Motion to Dismiss

Subject matter jurisdiction constitutes a threshold inquiry.  See Steel Co. v. Citizens for a

Better Env't, 523 U.S. 83, 94 (1998).  Where subject matter jurisdiction is challenged pursuant to

USCIT Rule 12(b)(1), "the burden rests on plaintiff to prove that jurisdiction exists."  Lowa, Ltd.

v. United States, 561 F. Supp. 441, 443 (1983), aff'd, 724 F.2d 121 (Fed. Cir. 1984) (quoted in

Pentax Corp. v. Robison, 125 F.3d 1457, 1462 (Fed. Cir. 1997), modified in part, 135 F.3d 760

(Fed. Cir. 1998)).  Here, AEFTC filed a motion to dismiss, alleging that Perfectus failed to timely

---

[5]  The court grants the motion to supplement and takes judicial notice of the fact that the United
States filed a complaint in United States District Court for the Central District of California in a
matter captioned United States v. Real Property Located at 10681 Production Avenue, Fontana
California, Court No. 5:17-cv-01872.  See United States v. New-Form Mfg. Co., 27 CIT 905, 917
n.14, 277 F. Supp. 2d 1313, 1325 n.14 (2003) (noting that courts frequently take judicial notice of
other courts' records) (citing Genentech, Inc. v. U.S. Int'l Trade Comm'n, 122 F.3d 1409, 1417
n.7 (Fed. Cir. 1997)).  The court further takes judicial notice of the contents of that complaint, but
only to the extent that the United States made the allegations and other statements contained within
and filed them in district court.  The court does not take judicial notice of the contents of the
complaint for the truth of what it asserts because the factual allegations contained therein may be
subject to reasonable dispute.  See Fed. R. Evid. 201(b) ("The court may judicially notice a fact
that is not subject to reasonable dispute because it . . . can be accurately and readily determined
from sources whose accuracy cannot reasonably be questioned."); see also 28 U.S.C. § 2641
(stating that the Federal Rules of Evidence apply to all civil actions, with certain exceptions not
relevant here, in the U.S. Court of International Trade).  Even if the court were to take judicial
notice of the complaint for the truth of what it asserts, this matter's disposition would not change.

commence this action as required by the jurisdictional requirements set forth in 19 U.S.C. § 1516a(a)(2)(A), and that as a result, the court lacks subject matter jurisdiction over Perfectus's complaint pursuant to USCIT Rule 12(b)(1).  See Def.-Inter.'s MTD at 1.

Perfectus, as plaintiff, contends that there is subject matter jurisdiction.  The defendant, the Government -- though urging that on the merits plaintiff's motion for judgment on the agency record should fail -- at the same time supports Perfectus's contention that the complaint was timely filed and that this court has jurisdiction.

Perfectus filed this action asserting jurisdiction under 28 U.S.C. § 1581(c).  Compl. ¶ 3; First Amended Compl. ¶ 3, May 2, 2018, ECF No. 12.  28 U.S.C. § 1581(c) confers on this court "exclusive jurisdiction of any civil action commenced under section 516A . . . of the Tariff Act of 1930," as amended (the "Act").  28 U.S.C. § 1581(c).  The Act was amended to include the provisions on judicial review through the Trade Agreements Act of 1979.  H. Rep. No. 96-317 at 179–82 (1979); S. Rep. 96-249 at 27–28 (1979).  Section 516A of the Act, codified at 19 U.S.C. § 1516a, enumerates eight different determinations in antidumping and countervailing duty proceedings subject to judicial review.  Through the Trade and Tariff Act of 1984, Congress added the provision to 19 U.S.C. § 1516a specifically identifying scope rulings as reviewable determinations and providing the deadline to appeal such determinations.  See 19 U.S.C. § 1516a(a)(2)(B)(vi) (making reviewable "[a] determination by the administering authority as to whether a particular type of merchandise is within the class or kind of merchandise described in an existing finding of dumping or antidumping or countervailing duty order"); H. Rep. No. 98-1156, at 91 (1984) (Conf. Rep).

The statute distinguished between those determinations for which the deadline for filing an appeal would be based on the date of publication of the applicable determination in

the Federal Register and those determinations for which the deadline for filing an appeal

would be based on the date of mailing of a determination. Section 1516a(a)(2) provides that,

"in general," judicial review of determinations on the record must be commenced within thirty

days after "the date of publication in the Federal Register." 19 U.S.C. § 1516a(a)(2)(A)(i).

However, judicial review of a determination described in clause (vi) of subparagraph (B) --

such as the 6xxx Final Scope Ruling currently before the court -- must be commenced thirty

days after "the date of mailing of a determination." 19 U.S.C. § 1516a(a)(2)(A)(ii).[6] This

distinction was necessary for scope determinations by Commerce because they, unlike the

other determinations identified in the statute, were not published in the Federal Register.[7]

When these provisions were added to the statute, in 1984, email or electronic notification of

Commerce's determinations was not possible. Thus, for a determination that would not be

published in the Federal Register, the only way to notify interested parties of a final ruling

was by post.

---

[6] 19 U.S.C. § 1516a(a)(2)(A) provides that:

   (A) In general.
   Within thirty days after -

   (ii) the date of mailing of a determination described in clause (vi) of subparagraph (B),

   an interested party who is a party to the proceeding in connection with which the matter
   arises may commence an action in the United States Court of International Trade by filing
   a summons, and within thirty days thereafter a complaint, each with the content and in the
   form, manner, and style prescribed by the rules of that court, contesting any factual findings
   or legal conclusions upon which the determination is based.

[7] Some years after the 1984 statute was enacted, Commerce's regulations regarding Federal
Register publication provided for publication on a quarterly basis of scope rulings (although there
was no amendment to the statute). See 19 C.F.R. § 351.225, 62 Fed. Reg. 27,405 (May 19, 1997)
("On a quarterly basis, the Secretary will publish in the Federal Register a list of scope rulings
issued within the last three months. This list will include the case name, reference number, and a
brief description of the ruling.").

Section 1516a(a)(2)(A)(ii) does not define "mailing."  With respect to review of a scope determination, Commerce has interpreted "mailing" to mean the transmission of materials by mail or courier as understood in common parlance -- for example, via the United States Postal Service -- and as was understood in 1984 when the statute was enacted.  Here, Commerce issued a final scope ruling concerning the merchandise at issue on June 13, 2017, and subsequently mailed that final scope ruling to Perfectus on March 27, 2018.  Proof of Mailing.  Perfectus commenced this action within thirty days of that mailing: on April 23, 2018, Perfectus filed a summons with this court.  Summ.  Perfectus (joined by the Government) thus asserts that it commenced its action within the requisite thirty days and that this court therefore has jurisdiction.

AEFTC, however, argues that Perfectus did not timely commence this action.  AEFTC notes that Commerce notified the parties of the final scope ruling through an email notification produced by the Antidumping and Countervailing Duty Centralized Electronic Service System ("ACCESS")[8] on June 14, 2017.  Def-Inter.'s MTD Br. at Ex. 3.  According to AEFTC, this email notification constitutes a "mailing," and thus Perfectus's commencement of this action on April 23, 2018 was outside the statutory window and untimely.  AEFTC asserts that "the Court should interpret 'mailing' within the meaning of 19 U.S.C. § 1516a(a)(2)(A) to include electronic mail notifications" because "[t]he term mail in the statute does not expressly limit itself to only hand mailing."  Id. at 7.

The court does not consider AEFTC's argument persuasive.  "Since section 1516a(a)(2)(A)

---

[8]  ACCESS is Commerce's centralized electronic service system that has been in effect since 2010.  See Import Administration IA ACCESS Pilot Program, 75 Fed. Reg. 32,341 (Dep't of Commerce June 8, 2010); Antidumping and Countervailing Duty Proceedings: Electronic Filing Procedures; Administrative Protective Order Procedures, 75 Fed. Reg. 44,163 (Dep't of Commerce July 28, 2010); Antidumping and Countervailing Duty Proceedings: Electronic Filing Procedures; Administrative Protective Order Procedures, 76 Fed. Reg. 39,263 (Dep't of Commerce July 6, 2011).

specifies the terms and conditions upon which the United States has waived its sovereign immunity

in consenting to be sued in the Court of International Trade, those limitations must be strictly

observed and are not subject to implied exceptions." Georgetown Steel Corp. v. United States,

801 F.2d 1308, 1312 (Fed. Cir. 1986) (citing Lehman v. Nakshian, 453 U.S. 156, 161 (1981)); see

also Orlando Food Corp. v. United States, 423 F.3d 1318, 1320 (Fed. Cir. 2005) ("Courts are not

free to infer waivers of sovereign immunity.") (citing Library of Cong. v. Shaw, 478 U.S. 310, 318

(1986)).  Where a waiver of sovereign immunity is at issue, the language of the statute must be

strictly construed, and any ambiguities resolved in favor of immunity.  See Orlando Food, 423

F.3d at 1320 (noting that "any express waivers must be narrowly construed") (citing Library of

Cong., 478 U.S. at 318); United States v. Williams, 514 U.S. 527, 531 (1995) (stating that, in

resolving questions about the waiver of sovereign immunity, "we may not enlarge the waiver

beyond the purview of the statutory language").  Here, a strict construction limits the definition of

"mailing" to a physical, hand-mailing -- extant in 1984 when the legislation was enacted -- as

opposed to an electronic missive (not then available).  AEFTC has not presented any authority

suggesting that Congress intended the "date of mailing" to include transmission by electronic

means, nor has the court found such authority.

The court's conclusion is consistent with this court's prior, persuasive cases addressing

whether electronic forms of communication constitute "mailing."  In Bond Street, Ltd. v. United

States, where plaintiff commenced the action for review after fax notification but there was no

mailing of the final scope ruling, this court held that a fax did not satisfy the statutory mailing

requirement and dismissed the matter, without prejudice, for want of jurisdiction.  31 CIT 1691,

1695, 521 F. Supp. 2d 1377, 1381–82 (2007) (citing Georgetown Steel, 801 F.2d at 1312).

Similarly, in Medline Indus. v. United States, where plaintiff commenced the action after email

notification but before the mailing of the final scope ruling, this court held that an "email message" did not satisfy the statutory "mailing" requirement and disposed of the matter in the same fashion as the <u>Bond Street</u> court.  37 CIT __, __, 911 F. Supp. 2d 1358, 1361–62 (2013).[9]

AEFTC contends that <u>Bond Street</u> and <u>Medline</u> are distinguishable because the plaintiffs in <u>Bond Street</u> and <u>Medline</u> did not wait "an unreasonable amount of time" prior to filing.  Perfectus's diligence is not relevant here because (i) the statute does not contain a diligence requirement and (ii) Perfectus filed within thirty days of Commerce's physical mailing.  Even if the statute contained a diligence requirement, Perfectus notified Commerce in August 2017 that it had yet to receive a physical mailing of the final scope ruling.  Additionally, Perfectus even threatened litigation to compel the mailing.  <u>See</u> <u>supra</u>, n.4.

AEFTC also argues that <u>Bond Street</u> and <u>Medline</u> are distinguishable because the underlying proceedings pre-date ACCESS's use in antidumping and countervailing duty proceedings, and that an ACCESS notification constructively satisfies the "mailing" requirement.  General widespread use of email and fax technology pre-dates both <u>Bond Street</u> and <u>Medline</u>, yet the court in those cases declined to expand the statutory definition out of concern for impermissibly enlarging the waiver of sovereign immunity contained in section 1516a(a)(2)(A).  <u>See, e.g.</u>, <u>Medline</u>, 911 F. Supp. 2d at 1361 ("Although email is a widespread means of communication, Medline has not demonstrated that an email is sufficient to commence the filing period under section 1516a(a)(2)(A)(ii).").  Therefore, <u>Bond Street</u> and <u>Medline</u> are not distinguishable from the case

---

[9] <u>Bond Street</u> and <u>Medline</u> were cases in which this court dismissed actions as premature because a party attempted to commence an action <u>before</u> the mailing of a final scope ruling.  Conversely, this court dismissed an action as untimely where a party failed to commence an action within thirty days of the mailing of a final scope ruling.  <u>See</u> <u>Bags on the Net Corp. v. United States</u>, 33 CIT 315, 325, 612 F. Supp. 2d 1341, 1348 (2009) (dismissing the action because plaintiff commenced the action more than 75 days after the mailing of the final scope ruling).  In these cases, in contrast to the case now before the court, the Government challenged the court's jurisdiction.

here and are persuasive.

AEFTC also draws attention to Perfectus's concession of actual notice of the final scope

ruling as of June 14, 2017.  Def.-Inter.'s MTD Reply at 10.  However, the statute does not reference

actual notice when setting the filing deadline; it only refers to the date of mailing.  19 U.S.C. §

1516a(a)(2)(A)(ii).  Therefore, the court finds this argument unpersuasive.[10]

In short, AEFTC's assertion that a notification generated by ACCESS triggers the clock[11]

for judicial review is unsupported. [12]  This case was brought within thirty days after the date of

mailing of Commerce's determination.  Commerce mailed the 6xxx Final Scope Ruling on March

27, 2018.  Proof of Mailing.  Perfectus commenced this case on April 23, 2018, 27 days after the

---

[10] AEFTC contends that several cases before this Court have proceeded without explicit reference
to a physical mailing.  Def.-Inter.'s MTD Reply at 6–7.  However, the question of physical mailing
was not raised in any of those cases and any speculation as to jurisdiction is not warranted.

[11] Further undercutting AEFTC's assertion is that Commerce's ACCESS Handbook on Electronic
Filing Procedures, available on the ACCESS website and attached as Exhibit 2 to AEFTC's
motion, expressly states that the Handbook does not supersede the requirements of the Tariff Act
of 1930 and Commerce's regulations:

> In event of a conflict between the Tariff Act of 1930, as amended ("the Act"), the
> Department's regulations, and this Handbook, the applicable provisions of the Act
> and the Department's regulations shall govern.  This Handbook is designed to be
> read in conjunction with the Department's regulations, 76 FR 39263 ("Final Rule")
> and the ACCESS External User Guide.  This Handbook does not alter or waive any
> provisions governing the filing of documents with entities and/or persons other than
> the Department.

ACCESS Handbook at 5.  The Department's regulations incorporate the ACCESS handbook.
19 C.F.R. § 351.303(b)(2).

[12] In support of its argument that ACCESS email notification constitutes "mailing" within the
meaning of 19 U.S.C. § 1516a(a)(2)(A)(ii), AEFTC states that "this [c]ourt no longer hand-mails
its decisions and it provides notice through its electronic docketing system called CM/ECF."  Def.-
Inter.'s MTD Br. at 11.  Needless to say, the procedures of this court do not concern whether email
notification triggers the time to contest scope rulings, and in any event, do not supersede the laws
conferring subject matter jurisdiction on this court.

date on which Commerce mailed the scope ruling.  The court concludes that Perfectus's complaint

was timely and denies AEFTC's motion to dismiss.  The court has jurisdiction pursuant to 28

U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(vi).

### II.  Motion for Judgment on the Agency Record

The standard of review in this action is set forth in 19 U.S.C. § 1516a(b)(1)(B)(i): "[t]he

court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported

by substantial evidence on the record, or otherwise not in accordance with law."  According to

Perfectus, its merchandise is not within the scope of the Orders because it qualifies for the finished

merchandise exclusion.  Perfectus further argues that Commerce's issuance of a scope ruling here

was improper because it did not initiate a formal scope inquiry and that the record does not indicate

the merchandise at issue was being produced or imported at the time the scope ruling was issued.

Perfectus also contends that Commerce should not have instructed Customs to retroactively

suspend liquidation because liquidation of the merchandise at issue was never suspended in the

first place.  For the reasons described below, the court denies Perfectus's motion for judgment on

the agency record.

### A.  The Merchandise at Issue Fits Within the Plain Language of the Scope of the Orders and Does Not Qualify for Any Exclusions.

According to the Government, the finished merchandise exclusion does not apply to the

merchandise at issue for two reasons: first, the merchandise at issue consists entirely of aluminum

extrusions, and, second, the merchandise at issue is not suitable for use as a pallet and is thus not

a finished product.  Perfectus contends that both these bases are incorrect.[13]

---

[13]  Commerce did not address Perfectus's argument that "fake" pallets or "scrap" are necessarily outside the scope of the Orders, but this argument is unpersuasive, as the Orders' plain language includes scrap aluminum extrusions.  Moreover, this argument is only relevant to Commerce's alternative basis for its conclusion which, as discussed infra, n.14, the court need not reach.

The relevant scope language includes "aluminum extrusions which are shapes and forms, produced by an extrusion process, made from aluminum alloys having metallic elements corresponding to the alloy series designations published by the Aluminum Association commencing with the numbers 1, 3, and 6." <u>Antidumping Duty Order</u>, 76 Fed. Reg. at 30,650. Further, "[a]luminum extrusions are produced and imported in a wide variety of shapes and forms, . . . [and] may also be fabricated, i.e., prepared for assembly[,] . . . [which] include[s], but [is] not limited to, extrusions that are cut-to-length." <u>Id.</u>  "Subject extrusions may be identified with reference to their end use . . . .  Such goods are subject merchandise if they otherwise meet the scope definition, regardless of whether they are ready for use at the time of importation." <u>Id.</u> at 30,651.   The relevant language excludes from the scope "finished merchandise containing aluminum extrusions <u>as parts</u> that are fully and permanently assembled and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels." <u>Id.</u> (emphasis added).   The merchandise at issue consists of "certain aluminum extrusions from [China] made of series 6xxx aluminum alloy which are cut-to-length and welded together in the form of a pallet, regardless of producer or exporter." <u>6xxx Final Scope Ruling</u> at 1.

The court concludes that Commerce's determination that the pallets are within the scope of the <u>Orders</u> and do not qualify for the finished merchandise exclusion because they exist entirely of aluminum extrusions and contain no other materials "as parts" is in accordance with law.[14] First, an alternative interpretation would result in reading out the "as parts" term from the relevant scope language.  Second, the plural construction of "as parts" requires the finished merchandise

---

[14]  The court therefore does not address Commerce's alternative basis for its determination.

exclusion to cover products consisting of both aluminum extrusions and non-extruded aluminum

parts; an alternative interpretation would, as Commerce noted in its 6xxx Final Scope Ruling,

allow the finished merchandise exclusion to "swallow the rule embodied by the scope." Third, the

examples given in the finished merchandise exclusion's text contain both an aluminum extrusion

and a non-aluminum component. Thus, in light of the plain language of the Orders, the court

concludes that Commerce did not err by concluding that the meaning of "as parts" in the context

of the finished merchandise exclusion requires both aluminum extrusion and non-aluminum

extrusion components.

        In Perfectus's view, this interpretation is incorrect because the Federal Circuit's opinion in

Whirlpool Corp. v. United States, 890 F.3d 1302 (Fed. Cir. 2018), "made it clear that Commerce

erred in interpreting the Orders to require goods qualifying for the finished merchandise exclusion

to also have non-extruded aluminum components." Pl.'s 56.2 Br. at 14. However, the Federal

Circuit made no such pronouncement in Whirlpool. In that case, the product at issue was finished

merchandise containing aluminum extrusions and non-aluminum extrusions; the Federal Circuit

addressed whether an exception for fasteners to the finished good kits exclusion applied to the

finished merchandise exclusion as well. The fastener exception states that "[a]n imported product

will not be considered a 'finished goods kit' and therefore excluded from the scope of the

investigation merely by including fasteners such as screws, bolts, etc. in the packaging with an

aluminum extrusion product." Whirlpool, 890 F.3d at 1306 (quoting Meridian, 851 F.3d at 1385).

The Federal Circuit held that, based on the plain language of the fastener exception, the fastener

exception applied only to the finished good kits exclusion from the scope order and remanded to

Commerce on that basis. Id. at 1310–11. The Federal Circuit did not decide whether the products

at issue in that case "me[t] the requirements for the finished merchandise exclusion." Id. at 1311.

Nor did the Federal Circuit determine that a product composed entirely of aluminum extrusions --

unlike the product at issue in Whirlpool, which contained non-aluminum extrusion parts -- would

be eligible for the finished merchandise exclusion.  Perfectus's argument is therefore inapposite.

Moreover, Meridian, 851 F.3d 1375, supports Commerce's interpretation.  In Meridian, the

Federal Circuit, in interpreting the separate "finished goods kit" exclusion of the Orders at issue

here, noted that "[a]lthough not necessary to our analysis . . . [t]he plain text of the other passages

in the Orders thus contemplates a basic divide between products whose components relevant to

the scope inquiry consist of non-aluminum extrusion parts, which are excluded from the scope of

the Orders, and products whose components relevant to the scope inquiry contain only aluminum

extrusion parts, which are not excluded."  Meridian, 851 F.3d at 1384.

Perfectus argues that the relevant language in Meridian concerns the finished goods kit

exclusion, not the finished merchandise exclusion, and is thus inapposite.[15]  Pl.'s Reply to 56.2

Mot. at 11 n.13.  However, the issue in Meridian and the issue here are meaningfully similar.

Meridian's analytical approach to the text of the Orders -- the contemplation of a "basic divide"

between merchandise containing only aluminum extrusions and merchandise with non-aluminum

extrusion components -- easily applies to the finished merchandise exclusion.

Perfectus also takes issue with Commerce's reliance on the fact that the listed examples in

the exclusion's text are unlike the products at issue.  Perfectus casts a wide net in search of

---

[15]  Perfectus also cites Rubbermaid Com. Prods. LLC v. United States, No. 11-00463, 2015 WL
4478225 at *3 n.2 (Ct. Int'l Trade 2015).  Pl's Reply to 56.2 Mot. at 10 n.9.  Rubbermaid involved
interpreting the Orders at issue here.  According to Perfectus, Rubbermaid supports the proposition
that the finished merchandise exclusion covers products consisting only of aluminum extrusion
parts.  This argument is unavailing, as the Rubbermaid court's footnoted discussion of this issue
explicitly did not resolve it.

authority supporting the proposition that lists need not be exhaustive, Pl.'s Reply to 56.2 Mot. at

11 n.11, but fails to persuade the court that Commerce's interpretation was incorrect.

As Commerce noted, a product consisting entirely of aluminum extrusions, "real" or

otherwise, is unlike any of the examples listed.  The authority Perfectus cites, see Pl.'s Reply to

56.2 Mot. at 11 n.11, only suggests that lists do not need to be exhaustive.  It does not affirmatively

suggest that products unlike items entered on a list should receive treatment identical to the listed

items.  The issue Perfectus faces here is not that the list of example products covered by the

finished merchandise exclusion is exhaustive -- it clearly is not -- but instead that the product

Perfectus would have covered by the finished merchandise exclusion is substantially unlike any of

the examples provided.  Perfectus's products consist entirely of aluminum extrusions, whereas all

the examples in the Orders are made of both aluminum extrusions and non-aluminum extrusion

parts.  See, e.g., Antidumping Duty Order, 76 Fed. Reg. at 30,651.  For these reasons, the court

concludes that Commerce's determination Perfectus's merchandise does not qualify for the

finished merchandise exclusion and is within the plain language of the scope is in accordance with

law.

### B. Commerce Properly Issued a Scope Ruling Without Initiating a Formal Scope Inquiry.

Commerce issued a final scope ruling in this matter without initiating a formal scope

inquiry.  Perfectus argues that this was inappropriate because the merchandise at issue was not

unambiguously within the Orders' scope.  The court concludes that Commerce's instructions were

proper because the merchandise at issue was unambiguously within the plain language of the

Orders' scope.

As discussed above, the plain language of the Orders places the merchandise at issue within

the scope, and the finished merchandise exclusion does not cover products consisting entirely of

aluminum extrusions.  However, Perfectus argues that the 6xxx Final Scope Ruling's reference to

the 19 C.F.R. § 351.225(k)(1) factors -- and particularly to prior scope rulings[16] -- means that

Commerce must have determined that the text of the Orders is ambiguous.  Pl.'s 56.2 Br. at 7.

Perfectus's contention is unpersuasive.  Prior to reaching the (k)(1) analysis, Commerce had

determined that the plain language of the Orders sufficed to place the products at issue within the

scope.  Commerce's subsequent (k)(1) analysis is part of a "belt-and-suspenders" approach, and it

would be strange to penalize an agency's analytical thoroughness.  The fact that the 6xxx Final

Scope Ruling describes how its interpretation is consistent with prior final scope rulings neither

means that Commerce's determination relies on this consistency, nor renders the text of the Orders

ambiguous.

Finally, Perfectus argues that the fact Commerce previously declined to find that 6xxx

pallets were within the scope means that the products at issue in this case were necessarily outside

the scope.  Pl.'s 56.2 Br. at 23–24 (citing Antidumping and Countervailing Duty Orders on

Aluminum Extrusions from the People's Republic of China: Final Scope Ruling on Certain

Aluminum Pallets (Dec. 7, 2016), P.R. 31 ("1xxx Final Scope Ruling")).  However, the 1xxx Final

Scope Ruling declined to make a determination about products made of aluminum alloy in any

series other than 1xxx because the record in that proceeding did not include evidence of existing

merchandise for any alloy other than 1xxx.  For these reasons, the court concludes that Commerce

properly issued a scope ruling despite not initiating a formal scope inquiry.

---

[16]  See, e.g., Antidumping and Countervailing Duty Orders on Aluminum Extrusions from the
People's Republic of China: Final Scope Ruling on Certain Aluminum Pallets (Dec. 7, 2016), P.R.
31 (finding that pallets composed of 1xxx alloy aluminum extrusions were within the scope of the
Orders).

### C. *Commerce Properly Issued a Scope Ruling Because the Merchandise at Issue Was in Existence.*

Perfectus argues that Commerce improperly issued a scope ruling by allegedly deviating from a practice of only issuing scope rulings for products "currently in production."  Pl.'s Reply to 56.2 Mot. at 16.  Perfectus asserts that the 1xxx Final Scope Ruling and a Federal Register notice are evidence of this practice.  See Pl.'s 56.2 Br. at 18–20 (quoting 1xxx Final Scope Ruling at 12; Antidumping and Countervailing Duty Proceedings: Documents Submission Procedures; APO Procedures, 73 Fed. Reg. 3634, 3639 (January 22, 2008) ("Federal Register Notice")).  Both the 1xxx Final Scope Ruling and the Federal Register Notice do discuss evidence of production; however, Perfectus mischaracterizes Commerce's practice by ignoring key language in both documents.  Commerce explains that its practice is to "not conduct hypothetical scope rulings on products that are not yet in production," 1xxx Final Scope Ruling at 12 (emphasis added); that is, Commerce "will not issue a scope ruling or conduct a scope inquiry on a purely hypothetical product," Federal Register Notice, 73 Fed. Reg. at 3639.   In this context, Commerce's determination, as explained in the 6xxx Final Scope Ruling, is consistent with conducting scope inquiries on existing -- i.e., not hypothetical -- products:

> [Commerce]'s practice with respect to scope ruling requests is not limited to products which are continuously being imported, but, rather, the requesting party must be able to show that the product is in existence, for instance, by demonstrating that the product is in commercial production or has been imported.  We find that the petitioner has satisfied this burden, regardless of whether the merchandise is already imported.

6xxx Final Scope Ruling at 15.  Moreover, even were Commerce's decision to issue a scope ruling for a product in existence, but not currently in production, a deviation from its typical practice, Commerce provided an appropriate explanation: "[w]ere we to adopt the view of Perfectus, this would limit our scope rulings only to products which were continually subject to importation,

creating a loophole for parties to avoid a ruling on merchandise which might otherwise be subject to an AD/CVD order." Id.; see Consol. Bearings Co. v. United States, 348 F.3d 997, 1007 (Fed. Cir. 2003) ("If that analysis shows that Commerce acted differently in this case than it has consistently acted in similar circumstances without reasonable explanation, then Commerce's actions will have been arbitrary.") (citing RHP Bearings v. United States, 288 F.3d 1334, 1347 (Fed. Cir. 2002)); Nakornthai Strip Mill Pub. Co. v. United States, 32 CIT 1272, 1276–77, 587 F. Supp. 2d 1303, 1307–08 (2008) (noting that Commerce may "change its policies and practices as long as they are reasonable and consistent with their statutory mandate [and] may adapt its views and practices to the particular circumstances of the case at hand, so long as the agency's decisions are explained and supported by substantial evidence on the record") (quoting Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States, 32 CIT 663, 533 F. Supp. 2d 1290, 1297 (2008)); Hyundai Steel Co. v. United States, 41 CIT __, __, 279 F. Supp. 3d 1349, 1371 (2017). Thus, Commerce's issuance of a scope ruling was not improper.

### D.  The Issue of Liquidation Is Moot.

Commerce instructed Customs to continue to suspend liquidation of entries made prior to the date of the 6xxx Scope Ruling Request. See, e.g., Countervailing Duty Order, 76 Fed. Reg. 30,653 at 30,654. As discussed above, the plain language of the Orders places the merchandise at issue here within the scope -- therefore, the products at issue here were clearly subject to suspension of liquidation. See Sunpreme Inc. v. United States, 924 F.3d 1198, 1213 (Fed. Cir. 2019) (noting that "[w]hen, based on examination of the product in question and the plain meaning of the words in an antidumping or countervailing duty order, there is no question that the product is [] within . . . the scope of the order," Customs' suspension of liquidation is a lawful performance of "its ministerial duties because the duty order in question is not ambiguous as to whether it

applies to the particular imported products") (citations omitted).   Nonetheless, Perfectus argues

that the liquidation of two entries of its merchandise in 2012 demonstrates that suspension of

liquidation had never occurred and thus suspension for entries of its products could not "continue."

.[17]  Pl.'s Reply to 56.2 Mot. at 17–18; 6xxx Final Scope Ruling at 15; Pl.'s Suppl. Br. at 2–3.

      The suspension of liquidation issue is moot, as it appears that Perfectus's entries were

liquidated, without being subject to antidumping or countervailing duties, prior to the initiation of

the anticircumvention inquiry.   See Perfectus's EOA and APO Application at Ex. A (Mar. 13,

2017), P.R. 10 ("Perfectus's EOA and APO App.").   The parties do not dispute that these

liquidations are final.[18]  See Def.'s Resp. to 56.2 Mot. at 23 (noting that "any entries made in 2015

would also have been liquidated before the initiation of the scope inquiry in 2017, presuming they

were entered like its two entries on the record and mischaracterized as Type 01"); Pl.'s Reply to

56.2 Mot. at 18 ("All entries of Perfectus' Series 6xxx aluminum pallets in years 2011 to 2015

have been liquidated and are now final.").[19]  The court therefore can provide no further relief,

---

[17]  Perfectus's reference to United Steel and Fasteners, Inc. v. United States, 41 CIT __, __, 203 F.
Supp. 3d 1235, 1241 (2017) is inapposite because the circumstances are not, as Perfectus claims,
"directly analogous."  Pl.'s Reply to 56.2 Mot. at 17.  United Steel concerned a matter where the
plain language of the relevant antidumping and countervailing duty orders was insufficient to
determine whether the products at issue in that case were within the scope.  That is manifestly
different from this case, as Commerce has correctly determined that the merchandise at issue is
within the scope per the Orders' plain language.

[18]  Voluntary reliquidation by Customs is governed by 19 U.S.C. § 1501, and Customs is time-
barred by the relevant version of the statute from reliquidating those entries to include the
assessment of antidumping and countervailing duties.  See 19 U.S.C. § 1501 (2012) (providing for
reliquidation within 90 days "from the date on which notice of the original liquidation is given or
transmitted to the importer, his consignee or agent"); 19 U.S.C. § 1501 (Supp. V 2012) (providing
for reliquidation within "[90] days from the date of the original liquidation").

[19]  The parties do not dispute that all the entries were liquidated pursuant to Customs' ordinary
practice.  To the extent that any entries had remained unliquidated, Commerce's instructions to
Customs were proper.  The Government notes that the entries Perfectus placed on the record, see
Perfectus's EOA and APO Application at Ex. A (Mar. 13, 2017), P.R. 10, were liquidated only

rendering the issue of Commerce's liquidation instructions to Customs moot.  See Heartland By-

Prod., Inc. v. United States, 568 F.3d 1360, 1368 (Fed. Cir. 2009) (finding liquidation instruction

issue moot when company no longer imported subject merchandise and Customs would not be

reliquidating the relevant entries to include the duties).

**CONCLUSION**

The court concludes that Perfectus timely filed its complaint and that Commerce properly

issued the 6xxx Final Scope Ruling finding that (1) the plain meaning of the unambiguous

language of the Orders includes the merchandise at issue, and (2) the finished merchandise

exclusion does not cover the products at issue because they consist entirely of aluminum extrusions

without initiating a formal scope inquiry.  Commerce's determination is sustained.

**SO ORDERED.**

*/s/   Gary S. Katzmann*
Gary S. Katzmann, Judge


Dated: July 1, 2019
          New York, New York

---

because they were misidentified as Type 01 (for which suspension of liquidation did not apply) instead of Type 03 (for which suspension of liquidation did apply).  Def.'s Resp. to 56.2 Mot. at 23; Def.'s Suppl. Br. at 3.
      Further, the cases Perfectus cites to support its argument that Commerce is not permitted to continue to suspend liquidation "for entries of products that were not suspended prior to the initiation of a scope inquiry" are distinguishable. Pl's 56.2 Br. at 21; Pl.'s Suppl. Br. at 2–3.  AMS Assocs. v. United States, 737 F.3d 1338 (Fed. Cir. 2013) and Sunpreme, 924 F.3d 1198 are distinguishable because, in those cases, Commerce clarified a product's status with respect to the scope.  AMS, 737 F.3d at 1343; Sunpreme, 924 F.3d at 1215 (stating that "the holding in this case applies only in a narrow set of circumstances because, when the duty order is clear and unambiguous, Customs can suspend liquidation of subject merchandise pre-scope inquiry and Commerce is free to continue that suspension") (citing AMS, 737 F.3d at 1344).  That is not the issue here; as Commerce correctly concluded, Perfectus's products fall within the scope per the Orders' plain language, and were thus unambiguously included within the scope of the Orders.  As discussed above, although Commerce's determination also referenced (k)(1) factors, that reference was not a concession that the language of the Orders was ambiguous.  Therefore, the court finds that Commerce properly instructed Customs to continue to suspend liquidation of entries made prior to the date of the scope ruling request.